IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA25-152

Filed 17 December 2025

Forsyth County, No. 24JA000072-330

In re: A.H.-G.

Appeal by Respondent-Mother and Respondent-Father from orders entered 9 September 2024 and 15 October 2024 by Judge David E. Sipprell in Forsyth County District Court. Heard in the Court of Appeals 23 September 2025.

*Theresa A. Boucher for Petitioner-Appellee Forsyth County Department of Social Services.*

*Mercedes O. Chut for Respondent-Appellant Mother.*

*Robert W. Ewing for Respondent-Appellant Father.*

*Smith, Anderson, Blount, Dorsett, Mitchell & Jernigan, L.L.P., by Justin B. Lockett and Michael W. Mitchell, for guardian ad litem.*

PER CURIAM.

Mother and Father appeal from an order adjudicating their minor child abused and neglected and from a disposition order maintaining the child's custody with the Forsyth County Department of Social Services. Mother argues that the trial court committed reversible error by allowing her, a minor parent with a Rule 17 guardian ad litem, to decide whether to waive her Fifth Amendment right against self-incrimination during her compelled testimony. Father argues the trial court erred in adjudicating the minor child as an abused juvenile because the findings of fact do not

support the inference that Mother and Father inflicted the child's injuries or allowed them to be inflicted. We affirm the orders as to both Mother and Father.

## I. Background

Mother and Father are the biological parents of Amy, a minor child born in December 2023.[1] In March 2024, when Amy was approximately three months old, the Forsyth County Department of Social Services ("DSS") received a report that Amy had been physically injured "by other than accidental means on multiple occasions while in the care of her parents[.]" Amy was taken to Brenner Children's Hospital on 4 March 2024, where she was diagnosed with nonaccidental trauma. Dr. Sarah Northrop examined Amy and completed a full skeletal survey, diagnosing Amy with "healing rib fracture[s]" on her right sixth, seventh, and eighth ribs, a "healing right tibia fracture," and bruises on her chest and back; Dr. Northrop noted that all fractures appeared to be about three weeks old. Dr. Northrop explained that Amy "is a developmentally[ ]appropriate 3 month old who is not mobile" and "cannot roll and cannot injure herself." Dr. Northrop opined that the injuries were all consistent with inflicted injury and inflicted trauma.

DSS began an investigation into Amy's injuries and learned that, prior to the hospital visit on 4 March 2024, Amy was living with Mother and Father in the home of her maternal grandparents ("Grandmother" and "Grandfather") and that there was

---

[1] We use a pseudonym to protect the identity of the minor child. *See* N.C. R. App. P. 42.

domestic violence history between Mother and Father. On 2 February 2024, Mother called Grandmother and reported that Father had assaulted her; Mother said that Father was holding Amy at the time of the assault and threatened to leave the home with Amy. Grandfather called law enforcement, and the police arrived at the home, but Mother and Father denied that any domestic violence had taken place; Father agreed to leave the home that night. Grandfather reported that he and Grandmother believed Amy sustained her injuries during the alleged domestic violence altercation and explained that Mother and Father did not let them see Amy for approximately three weeks after the alleged altercation. In late February, while giving Amy a bath, Grandmother observed a large bruise and mark on Amy's ribs. Grandmother confronted Mother and Father about the mark; Mother said that it was "a scratch" that had "happened on its own, and that it was not a concern." However, Grandmother also noticed that Amy was crying during the night, and she urged Mother to take Amy to see a doctor, which Mother did the following morning on 4 March 2024.

Following Dr. Northrop's examination of Amy and her findings of inflicted injury, Mother denied that Amy had any bruises or marks prior to Dr. Northrop's medical evaluation. Mother did not provide any further explanation as to the cause of Amy's multiple fractures and unexplained bruising. Mother stated that Amy "could have been hurt . . . during [a] birthday celebration when [she] was passed around to multiple house guests at the birthday celebration." When Father was

asked about the alleged domestic violence altercation, he denied any physical abuse and stated that he had a "verbal altercation" with Mother. Father also stated that Amy might have been hurt "by a guest" at the birthday celebration but otherwise did not provide any explanation as to the cause of Amy's multiple fractures and unexplained bruising. Due to Amy's injuries, Mother and Father entered into an agreement with DSS whereby Amy would live with her paternal grandmother in a temporary safety placement while the DSS investigation proceeded. Mother, Father, and the paternal grandmother all signed a "Safety Agreement" with DSS and agreed that Amy would have no unsupervised contact with Mother or Father. Dr. Northrop scheduled a follow-up "Child Medical Evaluation" for 15 March 2024.

On 15 March 2024, Dr. Northrop again examined Amy and found new injuries. Dr. Northrop noted that Amy had an "unexplained subconjunctival hemorrhage" in her eye, consistent with "direct impact trauma to the globe itself" or from "pressure events, such as smothering or suffocation." Dr. Northrop further noted that Amy had a new, unexplained fracture on her right second rib and that there was no "reasonable explanatory history" for these injuries. Dr. Northrop explained that the subconjunctival hemorrhage was "not the result of self-inflicted injury in [Amy's] age group and [was] not caused by routine handling or care of infants, or by routine infant processes such as crying, coughing[,] or vomiting." Dr. Northrop opined that the injuries were more likely than not the result of inflicted injury, and she explained that the subconjunctival hemorrhage was a type of "sentinel injury" that was a

"frequent[] harbinger[] for future more severe abuse." She also noted that Amy's new injuries were especially concerning in light of the open investigation by DSS and the Safety Agreement that Mother, Father, and the paternal grandmother signed with DSS.

After the medical evaluation on 15 March 2024, DSS interviewed Mother, Father, and the paternal grandmother. Mother and Father admitted that, between 4 March 2024 and 15 March 2024, they visited Amy every other day while her paternal grandmother supervised the visits. Aside from confirming that Mother and Father had visited with Amy, the paternal grandmother did not report anything to DSS. Due to Amy's new injuries, Mother and Father entered into another safety agreement whereby Amy would live with her paternal aunt and the parents would not have unsupervised contact with Amy. Dr. Northrop scheduled another follow-up "Child Medical Evaluation" for Amy on 5 April 2024.

At the medical exam on 5 April 2024, Dr. Northrop again found that Amy had a "third episode of unexplained injuries" and had "unexplained/poorly explained bruising . . . to the right shoulder, right thigh, and left back." Dr. Northrop said that the "provided history of a single impact to the shoulder [from being dropped into a sink while being bathed by the paternal aunt] does not adequately explain" the multitude of "impact injuries" on Amy's body, and she expressed further concern of "supervisional neglect" because the injuries occurred while Amy was in a second safety placement. She specifically found that "[a] fall or slip while being bathed in a

sink would also not adequately explain [Amy's] injuries." She stated that Amy's status as a four-month-old child and the "lack of appropriate supervision could lead to escalating injuries to include death." Based on the series of unexplained injuries inflicted on Amy, she was admitted to Brenner Children's Hospital for her safety.

Mother, Father, and the paternal aunt were interviewed by DSS following Amy's third medical exam. Mother stated that she had visited Amy seven times and that she never saw any marks or bruises on Amy; Father stated that he had visited Amy six times. The paternal aunt stated that Amy's new bruises "occurred when [Amy] slipped from her grasp while she was bathing her over a sink . . . on the morning of 4/5/24." She also stated that it was possible her own one-year-old child might have bitten Amy. The paternal aunt stated that Mother visited Amy "so often and for so long that there were some periods of time" when the paternal aunt could not supervise the visits. She also reported that the relationship between Mother and Father "is very toxic" and that she witnessed "frequent aggressive events between [Mother] and [Father] with [Amy] present."

Amy's paternal grandmother was also interviewed by DSS on 5 April 2024 following Amy's third medical exam; she told DSS that, on 13 March 2024, Mother and Father took Amy into a bedroom alone for approximately thirty minutes and she "was not able to supervise the visitation." She said that Father "left the house at one point to obtain medicine for [Amy] and she did not understand why." When Father returned, he went back into the bedroom with Mother and Amy and locked the door.

The paternal grandmother heard a verbal altercation between Mother and Father, and she heard a "physical struggle and pushing in the room." She threatened to call law enforcement on Mother and Father, and she kicked them out of her home. The paternal grandmother "observed [Amy] to be well, and to be calm, and that she did not notice the redness in [Amy's] eye until the next morning." She did not report this violation of the Safety Agreement to DSS when it occurred on 13 March 2024, and she did not report the violation when first interviewed by DSS on 15 March 2024 following Amy's second medical exam.

On 9 April 2024, DSS filed a juvenile petition alleging that Amy was an abused and neglected juvenile and obtained nonsecure custody of Amy on the same day. At the time of the filing of the petition, Mother was a sixteen-year-old juvenile and Father was an eighteen-year-old adult. On 2 August 2024, the matter came on for an adjudication hearing, and the trial court determined that Amy was an abused and neglected juvenile. The trial court held a disposition hearing on 30 August 2024 and, by order entered 15 October 2024, concluded that it was in Amy's best interest that she remain in DSS custody. The trial court allowed Mother to have supervised visitation with Amy for two hours per week, and it allowed Father to have separate supervised visitation with Amy for two hours per week. Mother and Father both gave proper written notices of appeal from the adjudication and disposition orders.

## II. Discussion

### A. Mother's Appeal

Mother's sole argument on appeal is that the trial court "committed reversible error by allowing [Mother], a minor parent with a Rule 17 [guardian ad litem], to decide whether to assert her Fifth Amendment right to remain silent during her compelled testimony." We disagree.

Whether a trial court acts contrary to a statutory mandate is a question of law reviewed de novo by this Court. *In re G.C.*, 230 N.C. App. 511, 515–16 (2013).

Our General Statutes mandate that "a guardian ad litem shall be appointed in accordance with the provisions of [N.C. Gen. Stat. §] 1A-1, Rule 17, to represent a parent who is under the age of 18 years and who is not married or otherwise emancipated." N.C. Gen. Stat. § 7B-602(b) (2023). Pursuant to Rule 17, the trial court must appoint a Rule 17 guardian ad litem ("GAL") for minor parents and incompetent adults when they are defendants in actions or special proceedings. *See* N.C. Gen. Stat. § 1A-1, Rule 17(b)(2) (2023). "The guardian so appointed shall . . . file his answer to the complaint," and "the court may proceed to final judgment as effectually and in the same manner as if there had been personal service upon the said infant or incompetent persons or defendants." *Id.*

Rule 17 "[GALs] are appointed to stand in place of minor children in all civil actions and proceedings as minors are presumed by law not to have the requisite capacity to handle their own affairs," and "the duties of the [GALs] are dictated by the action or proceeding in which the [GAL] has been appointed." *In re Papathanassiou*, 195 N.C. App. 278, 285–86 (2009) (citing *In re Clark*, 303 N.C. 592,

- 8 -

598 (1981)).  While a Rule 17 GAL appointed to a minor parent "divest[s] the parent of their fundamental right to conduct his or her litigation according to their own judgment and inclination," *In re J.A.A.*, 175 N.C. App. 66, 71 (2005) (citation omitted); *see* N.C. Gen. Stat. § 1A-1, Rule 17(b)(2), a Rule 17 GAL's role is to act "as a guardian of procedural due process for the parent, to assist in explaining and executing her rights . . . to the fullest extent feasible and to do all things necessary to secure a judgment favorable to such party," which is dependent on the individual facts of the case, *In re A.S.Y.*, 208 N.C. App. 530, 538–40 (2010) (citations and internal marks omitted) ("[W]hile in many cases the GAL may fulfill his or her duties in a termination proceeding by merely assisting the parent, at times it will be necessary for the GAL to take further action during the proceeding in order to represent the parent to the fullest extent feasible and to secure a judgment favorable to that parent.").

Once appointed, as our General Statutes prescribe for guardianships, the Rule 17 GAL "should seek to preserve for the incompetent person the opportunity to exercise those rights that are within his comprehension and judgment, allowing for the possibility of error to the same degree as is allowed to persons who are not incompetent." N.C. Gen. Stat. § 35A-1201(a)(5) (2023).[2]  Further, "[t]o the maximum

---

[2] While section 35A-1201(a) refers to guardians and not GALs, we find the statute instructive here as GALs function in a more limited scope and duration than a guardian.  *See In re Q.B.*, 375 N.C. 826, 837 n. 4 (2020) (noting guardianships under Chapter 35 are more stringent than Rule 17 GAL appointments); *Stark v. Ford Motor Co.*, 226 N.C. App. 80, 86 (2013) (contrasting "general guardian[s]" and GALs).

extent of his capabilities, an incompetent person should be permitted to participate as fully as possible in all decisions that will affect him." *Id.* In addition, "Rule 17 contemplates active participation of a GAL in the proceedings for which the GAL is appointed" such that "[t]he presence and active participation of a GAL appointed according to the provisions of Rule 17 effectively removes any legal disability of the party that is so represented." *In re D.L.P.*, 242 N.C. App. 597, 601 (2015) (quoting *In re A.S.Y.*, 208 N.C. App. at 538).

Here, Mother was appointed a Rule 17 GAL due to her age and status as a minor parent who was not married or otherwise emancipated. The trial court appointed Mother's Rule 17 GAL at some point before 14 May 2024, when the first hearing took place on the need for Amy to remain in nonsecure custody with DSS.[3] The transcript indicates the Rule 17 GAL was present at the adjudication hearing. The Rule 17 GAL did not speak when the trial court gave Mother a statement of her rights, and the trial court did not ask the Rule 17 GAL whether Mother should waive her right against self-incrimination under the Fifth Amendment to the Constitution of the United States. However, Mother's attorney did speak and object to Mother testifying at the adjudication hearing, and the trial court fully explained to Mother

---

[3] There is no order in the record showing the initial appointment of the Rule 17 GAL for Mother. However, in an order entered 14 May 2024, the trial court listed "Miya Bryant, Rule 17 GAL for [Mother]" as "present for the hearing," indicating that she was appointed some time before the first hearing on the need for Amy to remain in nonsecure custody with DSS. There also is no record evidence that Mother's Rule 17 GAL filed an answer.

her right to remain silent, which Mother affirmatively acknowledged.

The trial court had the following exchange with Mother's attorney and Mother when DSS called Mother to testify:

> [Mother's Attorney]: Your Honor, just for the record I would object to the County calling [Mother]. I understand that she is a parent in this case. However, she is also a juvenile and has the services of a Rule 17 Guardian ad Litem. So I would just like to put that objection on the record.
>
> The Court: All right. Well, the objection is overruled at this point. I will give her the same advisement. Is she, is she charged as well?
>
> [DSS]: She is under a Juvenile Petition.
>
> The Court: Okay.
>
> [Mother's Attorney]: That is, that is correct, Your Honor.
>
> The Court: Felony charges?
>
> [Mother's Attorney]: Yes, there are three felonies, Your Honor.
>
> The Court: Okay. All right. So, with regard to those three felony charges, [Mother], you do have the right to remain silent, okay. . . . .
>
> [Mother]: Thank you, your Honor.
>
> The Court: Now, I'm at this point, like with regard to the father that testified, I'm not willing to accept just a blanket refusal to testify based on the Fifth Amendment in this case. Because there again, are plenty of questions that could be asked of you that would be relevant to this proceeding, but not necessarily incriminating in your juvenile case. So I have to take it on a case-by-case basis. But just understand that you have that right. If you feel

> you are being asked a question that might, if answered, incriminate you in your criminal case then you have that right to raise your Fifth Amendment, and you can stop and decide whether or not it's something that you need to answer. Okay?
>
> [Mother]: Okay. Thank you, Your Honor.
>
> The Court: You have any questions about that?
>
> [Mother]: No, Your Honor.

Mother then testified for approximately one hour and gave what she contends to be potentially incriminating answers during her testimony, including that she lied to DSS and to her mother about Amy; that she was Amy's "primary care" during the time period in which Amy sustained her first set of injuries; and that she rejected Dr. Northrop's medical opinion that constipation did not cause Amy's rib fractures. Mother answered every question on direct examination except for one:

> [DSS Attorney]: So let's get back to [Amy's] injuries. How did she get the broken tibia?
>
> [Mother]: I couldn't -- I'd like to exercise my right to remain silent.
>
> [DSS Attorney]: So you're refusing to answer that question?
>
> [Mother's Attorney]: Objection, Your Honor. She's already exercised her right.
>
> The Court: Court notes that she is exercising her right to remain silent with regard to that question.

Our Supreme Court dealt with a similar issue in *In re W.K.*, 376 N.C. 269

(2020).[4]    In that case, the respondent-father asserted his Rule 17 GAL was insufficient because "the Rule 17 GAL spoke on the record only five times during [one] hearing and did not speak on the record at the August 2019 hearing." *Id.* at 275.  Our Supreme Court said,

> As to the Rule 17 GAL's participation during the August 2019 hearing, [the] respondent-father now contends that the Rule 17 GAL could have been more active by making statements in support of [the] respondent-father's counsel's motion for a continuance and could have "worked with" [the] respondent-father's counsel to present evidence in [the] respondent-father's favor at the August 2019 hearing after the motion for a continuance was denied.
>
> We disagree given that [the] respondent-father has not identified any actions his Rule 17 GAL could have taken that would have improved his chances to obtain a decision in his favor, has not shown the Rule 17 GAL did not guard his due-process rights, and has not shown his Rule 17 GAL did not otherwise adequately assist him in executing his legal rights.   It is well-established that "we will not presume error from a silent record."  For example, there is no evidence of what, if anything, the Rule 17 GAL could have offered in support of [the] respondent-father's arguments to the trial court regarding the potential replacement of [the] respondent-father's trial counsel. Similarly, [the] respondent-father argues his GAL should have addressed the trial court in support of his counsel's multiple motions to continue, but there is no evidence that the Rule 17 GAL could have offered anything beyond repeating counsel's arguments.  [The r]espondent-father contends his Rule 17 GAL could have worked with his counsel to present evidence favorable to him, but [the] respondent-father does not show his GAL had any such

---

[4] *In re W.K.* involves termination of parental rights proceedings and cites to N.C. Gen. Stat. § 7B-1101.1.  This case involves an adjudication of abuse and neglect and cites to section 7B-602. However, the language in sections 7B-1101.1(a)-(d) and sections 7B-602(a)-(d) is identical.

> evidence. Moreover, the record establishes that the evidence needed by [the] respondent-father's counsel could only come from [the] respondent-father, not from his GAL.
>
> [The r]espondent-father's arguments are founded on unwarranted assumptions that presume error where none is shown on the record. We therefore reject [the] respondent-father's . . . appellate argument because he has failed to show any reversible error by his Rule 17 GAL in the execution of his role in [the] respondent-father's case.

*Id.* at 275–76 (internal citations omitted).

Likewise, here, Mother has not shown what actions her Rule 17 GAL could have taken to secure a more favorable decision for her beyond that of the objection by her attorney. Mother's attorney stated his objection to Mother being called and objected after Mother invoked her Fifth Amendment right. Requiring the Rule 17 GAL, who was present at Mother's hearings, to also object is not a feasible step to act as a guardian of Mother's due process rights because, as our Supreme Court reasoned in *In re W.K.*, "there is no evidence that the Rule 17 GAL could have offered anything beyond repeating counsel's arguments." *Id.* at 276.

In addition, immediately after Mother's attorney objected, the trial court explained to Mother her right against self-incrimination, which Mother affirmatively acknowledged. Mother also stated she did not have any questions about the trial court's explanation. Further, there is no evidence provided in the record to indicate that she was legally incompetent for any reason other than her age, marital status, and unemancipated status, so that her affirmative acknowledgment of the trial

court's right to remain silent explanation fell outside of her comprehension or judgment. Rather, after her attorney objected to her testifying and after the trial court explained her Fifth Amendment right, Mother chose to answer certain questions but expressly exercised her right to remain silent herself in response to the broken tibia question.

While neither Rule 17 nor N.C. Gen. Stat. § 7B-602 specify what constitutes "active participation" by a Rule 17 GAL, the Rule 17 GAL's not repeating the objection of Mother's attorney nor interjecting to assert Mother's Fifth Amendment right where Mother affirmatively acknowledged she understood the trial court's explanation of her right does not reach the level of error, without additional evidence, for which our Courts have found a violation of Rule 17. *See, e.g., In re W.K.*, 376 N.C. at 275–76 (affirming termination of parental rights where a Rule 17 GAL "spoke on the record only five times during" a hearing, did not speak on the record during another hearing, and could not offer "anything beyond repeating counsel's arguments"); *In re D.L.P.*, 242 N.C. App. at 602 (vacating adjudication and disposition orders when the trial court conducted the hearing without the presence and participation of the Rule 17 GAL); *In re A.S.Y.*, 208 N.C. App. at 540 (vacating an order of parental rights where the respondent-mother was not represented by a Rule 17 GAL during the termination hearing). Whether it be for the absence of additional evidence or actions by the Rule 17 GAL, the absence of an order defining the guidelines of the Rule 17 GAL's appointment in the record evidence, or the absence of any on-the-record discussion

between Rule 17 GAL and Mother, "we will not presume error from a silent record." *In re W.K.*, 376 N.C. at 276.

Mother, DSS, and the Rule 17 GAL each rely substantially on *In re P.D.R.*, 224 N.C. App. 460 (2012). However, because *In re P.D.R.* was premised on statutory text which has since been amended or eliminated, S.L. 2013-129, 2013 N.C. Sess. Law 152, §§17, 32, we decline to use *In re P.D.R.* to guide our review here.

Therefore, the trial court did not err by allowing Mother to decide whether to assert her Fifth Amendment right.

## B. Father's Appeal

Father argues on appeal that "the trial court erred in adjudicating Amy as an abused juvenile because the trial court's competent evidentiary findings of fact do not support the inference that the respondent parents inflicted Amy's injuries or allowed them to be inflicted." Father does not challenge the trial court's adjudication of neglect.

We review a trial court's abuse adjudication to determine whether the trial court's findings of fact are supported "by clear and convincing evidence." *In re F.C.D.*, 244 N.C. App. 243, 246 (2015) (citation omitted). In turn, the trial court's conclusions of law must be properly supported by those findings of fact. *In re Gleisner*, 141 N.C. App. 475, 480 (2000). The trial court's findings of fact supported by clear and convincing evidence in an abuse adjudication are deemed conclusive even when there is evidence supporting contrary findings. *In re J.A.M.*, 372 N.C. 1, 8 (2019) (citations

omitted). Unchallenged findings of fact are presumed to be supported by competent evidence and are binding on appeal. *Koufman v. Koufman*, 330 N.C. 93, 97 (1991). The determination that a child is abused is a conclusion of law, which this Court reviews de novo. *In re Ellis*, 135 N.C. App. 338, 340 (1999) (citation omitted). Under de novo review, we "consider the matter anew and freely substitute our own judgment for that of the lower tribunal." *In re A.K.D.*, 227 N.C. App. 58, 60 (2013) (cleaned up).

An abused juvenile is any person less than 18 years old whose parent "(a) inflicts or allows to be inflicted upon the juvenile a serious physical injury by other than accidental means" or "(b) creates or allows to be created a substantial risk of serious physical injury to the juvenile by other than accidental means." N.C. Gen. Stat. § 7B-101(1)(a), (b) (2023). The trial court "is granted some discretion in determining whether children are at risk for a particular kind of harm given their age and the environment in which they reside." *In re A.D.*, 278 N.C. App. 637, 642 (2021) (quotation marks and citation omitted). "This Court has previously upheld adjudications of abuse where a child sustains non-accidental injuries, even where the injuries were unexplained, where clear and convincing evidence supported the inference that the respondent-parents inflicted the child's injuries or allowed them to be inflicted." *In re K.L.*, 272 N.C. App. 30, 39 (2020) (internal quotation marks and citation omitted). With young infants, "the decision of the trial court must of necessity be predictive in nature, as the trial court must assess whether there is a substantial risk of future abuse or neglect of a child based on the historical facts of

the case." *In re McLean*, 135 N.C. App. 387, 396 (1999).

Here, Father challenges certain findings of fact which determined that Amy was in the care of Mother and Father when she sustained her injuries. Father argues that there is not clear and convincing evidence to support that Mother and Father "were Amy's exclusive caretakers when she sustained her injuries" and that the trial court erred in concluding that Amy was an abused juvenile based on those unsupported findings. However, Father's argument is misplaced, as "[t]he adjudication of a child as abused concerns only the status of the child, not the fault or culpability of the parent." *In re K.W.*, 272 N.C. App. 487, 491 (2020) (citing *In re Montgomery*, 311 N.C. 101, 109 (1984)). And, here, the unchallenged findings of fact support that Amy was an abused child.

The trial court made the following relevant findings of fact:

> 10. On March 4, 2024, [Amy] was diagnosed with nonaccidental trauma at Brenner Children's Hospital. Dr. Sarah Northrop examined the child, reviewed her full skeletal survey, and interviewed the child's mother. [Amy] was determined to have the following injuries:
>
> > a. Healing lateral aspect of the right sixth, seventh, and eight[h] ribs
> >
> > b. Healing nondisplaced f[r]acture proximal right tibia metadiaphysis with callus formation and periosteal reaction consistent with a fracture that is at least 3 weeks of age.
>
> 11. Dr. Northrop provided an assessment that:
>
> > a. High concern for physical abuse
> >
> > b. Multiple unexplained fractures

c. Unexplained bruise to chest

d. Dermal melanocytosis

12. Dr. Northrop provided a medical opinion as follows:

a. [Amy] is a previously healthy 3-month-old who presents with concern for stomach pain and was found incidentally to have a healing rib fracture on abdominal x-ray and a healing right tibia fracture on skeletal survey. Both the rib fractures and the leg fracture are estimated to be about 3 weeks old. No history has been provided to explain these findings. No history has been provided to explain the bruise to the chest or back, which [Mother] states has been there for a few days.

b. [Amy] is a developmentally appropriate 3-month-old who is not mobile. She cannot roll and cannot injure herself. No history of trauma has been provided. These injuries are all concerning for inflicted injury. They are not consistent with injuries from birth as while they are healing, they are estimated to be 3 weeks old, and [Amy] is 3 months old. While she has not completed a full evaluation for bone health or for coagulopathies, she has no other history of fractures, she has no radiographic signs of problems with bony metabolism, she has not had any bruising or petechiae at sights of medical intervention (PIV site, blood pressure cuff), and there is no current laboratory evidence or family history of coagulopathies or of bony metabolic problems. These injuries are all most consistent with inflicted trauma.

13. Upon investigation, [DSS] learned that prior to the March 4, 2024, hospital visit, [Amy] lived with her parents in the home of her maternal grandparents. The primary caretakers for [Amy] were [M]other and [F]ather who had a history of reported domestic violence between them. On February 2[], 2024, [Mother] called her mother reporting

that she was assaulted by [Father] with [Amy] present.

14.  Reportedly, [Father] was holding the infant child, threatening to leave the home with [Amy].  The maternal grandparents were not in the home as they were working out of town and had not provided a plan for supervision for their 16-year-old daughter other than her boyfriend [Father], who they knew to be violent toward their daughter.  [Grandfather], the maternal grandfather of [Amy], called law enforcement to investigate the altercation in the home involving his daughter and granddaughter.

. . . .

18.  [Mother] denied that [Amy] had any bruises or marks prior to the medical evaluation by Dr. Northrop on March 4, 2024.  [Mother] stated her child had been crying on the night of March 3rd and that she became worried and took the child to the doctor the next day.  [Mother] provided no further explanation as to the cause of [Amy's] multiple fractures and unexplained bruising.

19.  . . . [Father] stated that all was well with [Amy] until the night of March 3, 2024, when she would not stop crying.  [Father] stated that he and [Mother] agreed to take the child to the doctor the next day.  [Father] provided no further explanation as to the cause of [Amy's] multiple fractures and unexplained bruising.

20.  After the medical examination of [Amy] on March 4, 2024, [DSS] and the parents entered into an agreement whereby [Amy] would reside in the home of her paternal grandmother . . . as a temporary safety provider, while the Child Protective Services Investigation proceeded.  [The paternal grandmother] and [Mother] and [Father] signed a Safety Agreement with [DSS] that the parents of [Amy] would have no unsupervised contact with [Amy].  Dr. Northrop scheduled a follow up Child Medical Evaluation for [Amy] on March 15, 2024.

21.  On March 15, 2024, [Amy] was again examined by Dr.

Northrop at Brenner Children's Hospital. Dr. Northrop noted additional injuries to [Amy], as follows:

a. High concern for new physical abuse

b. Unexplained subconjunctival hemorrhage

c. Unexplained likely new fracture to right second posterior lateral rib

d. Multiple old fractures as seen on previous inpatient consultation, hearing

e. Resolution of previously noted bruises

22. Dr. Northrop provided a medical opinion as follows:

a. [Amy] is a 3-month-old infant previously well-known to the [C]hild Protection Team from an inpatient consult on 3/5/2024. . . . She presents with new injuries that were first seen on day of presentation, 3/14/202[4]. The [subconjunctival hemorrhage] is most consistent with inflicted trauma and is not well-explained by coughing or crying. While severe coughing can cause [subconjunctival hemorrhages] in adults, this is not seen in the infant population. [subconjunctival hemorrhages] are a sentinel injury in infants and are concerning for more abusive injuries. A skeletal survey was done because of this, and it revealed a likely right second rib fracture. This will be confirmed on follow up skeletal survey, but it appears to have a fracture line which is more consistent with an actual fracture than a physiologic finding.

b. [Subconjunctival hemorrhages] are broken blood vessels under the surface of the eye and are usually the result of direct impact trauma to the globe itself. More rarely these can be resultant from increased intrathoracic pressure events, such as smothering or suffocation. These are not the result of self-inflicted injury in this age group and are not caused by routine handling or care of infants, or by routine

infant processes such as crying, coughing, or vomiting. The medical workup has failed to reveal underlying diagnoses that could contribute to their etiology. In the absence of a reasonable explanatory history these findings are more likely than not the result of inflicted injury.

c. In non-mobile infant[]s subconjunctival hemorrhages are considered sentinel injuries and while not life-threatening themselves they are frequently harbingers for future more severe abuse.

. . . .

27. [Paternal grandmother] was interviewed on April 5, 2024. She reported that she cared for [Amy] from March 4 to March 15, 2024. [Amy's] parents visited her every other day. [Paternal grandmother] reported that the parents did not reside in the home with her and [Amy] during that time. [Paternal grandmother] reported that on March 13, 2024, [Mother] and [Father] took [Amy] with them into one of the rooms and [paternal grandmother] was not able to supervise the visitation. She did not report this violation of the Safety Plan to [DSS]. [Paternal grandmother] also did not report this incident when she was interviewed on or about March 14, 2024.

28. After the medical examination of [Amy] on March 15, 2024, [DSS] and the parents entered into another agreement whereby [Amy] would reside in the home of . . . [Amy's] paternal aunt, as a temporary safety provider, while the Child Protective Services Investigation proceeded. [Paternal aunt], [Mother], and [Father] signed a Safety Agreement with [DSS] that the parents of [Amy] would have no unsupervised contact with [Amy]. Dr. Northrop scheduled a follow up Child Medical Evaluation for [Amy] on April 5, 2024.

29. Dr. Northrop examined [Amy] again on April 5, 2024. Dr. Northrop reported that: [Amy] is a previously healthy 4-month-old infant for a CME evaluation and was found to have her third episode of unexplained injuries.

Unexplained/poorly explained bruising in a non-mobile infant:

> a. The provided history of a single impact to the shoulder does not adequately explain bruising to the right shoulder, right thigh, and left back. A fall or slip while being bathed in a sink would also not adequately explain these injuries.
>
> b. The bruising to the leg and the shoulder could be consistent with teeth marks as in a bite, however no history of a bite has been provided.
>
> c. Bruises are the result of impact injuries, and these injuries represent impact to the back, shoulder, and front of the right thigh. [Amy] cannot roll and is not mobile. These injuries are considered sentinel injuries and while not life-threatening injuries they are frequently harbingers for future more severe abuse. This injury occurred while in a second Temporary Safety Placement.

. . . .

32. After the medical evaluation of April 5, 2024, [DSS] again interviewed [Mother] and [Father], along with [paternal aunt], the temporary safety provider. [Mother] reported that she had visited [Amy] seven times while the child remained with [paternal aunt]. [Mother] stated that she did not notice any marks or bruises on [Amy] during these visits. [Mother] stated that her last visit with [Amy] was on April 3, 2024. [Father] reported he visited [Amy] six times while [Amy] remained with [paternal aunt]. [Father] stated that he did not notice any marks or bruises on [Amy] during these visits. [Father] stated that his last visit with the child was on March 29, 2024.

33. [Paternal aunt] reported that the bruises seen on [Amy] on April 5, 2024, occurred when the child slipped from her grasp while she was bathing her over a sink in her home on the morning of April 5, 2024. [Paternal aunt] stated that it was also possible that her own one-year[-]old child might have bitten [Amy]. [Paternal aunt] stated that

[Amy's] parents visited the child was she was acting as a caretaker for [Amy]. [Mother] visited daily and was present so often and for so long that there were some brief periods of time when [paternal aunt] could not supervise her at all times. [Paternal aunt] reported that [Amy's] parents visited on one occasion at the same time, but they were all outside and she supervised them both. . . . .

. . . .

38. [Amy] suffered multiple rib fractures and a broken leg which have not been explained consistent with the medical findings by the child's parents.

39. [Amy] suffered at least 3 separate trauma incidents which resulted in injury to the child.

40. [Mother] and [Father] did not comply with the Safety Plan outlined with [DSS] after her injuries were first diagnosed and her need for a safe caretaker identified.

. . . .

42. Based upon the expert testimony of Dr. Northrop, an expert Pediatrics and Child Abuse, the court finds:

> a. [Amy] at age four months old could not inflict the diagnosed injuries on herself[.]
>
> b. The parents and caretakers for [Amy] have no[t] provided a reasonable explanation consistent with the medical findings and consistent with safe care for the child[.]
>
> c. [Mother] and [Father's] explanation that [Amy] was injured at her grandmother's birthday party while family members visited and the child was at all times being supervised by her parents and grandparents is not plausible and this explanation is not credible to the court as neither parent expressed that the child showed no distress or pain during that celebration.
>
> d. The eye injury suffered by [Amy] is the result of

inflicted trauma and the parents' explanation that she scratched herself causing the injury is not plausible and this explanation is not credible to the court[.]

e. The bruise injuries suffered by [Amy] are the result of inflicted trauma and the parents' explanation is not plausible and this explanation is not credible to the court. The explanation that [Amy] received bruising from being dropped in the kitchen sink while bathing is also not plausible and this explanation is not credible to the court.

These unchallenged findings of fact show that Amy sustained "unexplained" and "non-accidental" injuries and support the inference that Mother and Father "inflicted [Amy's] injuries or allowed them to be inflicted." *In re K.L.*, 272 N.C. App. at 39 (quotation marks and citation omitted). The unchallenged findings further show that Mother and Father "created or allowed to be created a substantial risk of serious physical injury" to Amy. *See* N.C. Gen. Stat. § 7B-101(1)(b); *In re M.G.*, 363 N.C. 570, 573 (2009). In turn, these unchallenged findings of fact support the trial court's conclusion of law that Amy "is an abused . . . juvenile as pursuant to [N.C. Gen. Stat. §] 7B-101(1)[.]"

## III. Conclusion

Because the trial court did not err by allowing Mother to invoke her Fifth Amendment right against self-incrimination, we affirm the trial court's adjudication and disposition orders as to Mother. As the unchallenged findings of fact support the trial court's conclusion of law that Amy is an abused juvenile, we affirm the trial court's adjudication and disposition orders as to Father.

AFFIRMED.

Before a panel consisting of Judges STROUD, COLLINS, and GRIFFIN.

Judge COLLINS concurs in part and dissents in part by separate opinion.

COLLINS, Judge, concurring in part and dissenting in part.

I concur with the majority opinion's Section II.B, which affirms the trial court's adjudication and disposition orders as to Father. Because I believe that the record shows that Mother's GAL did not actively participate in the court proceedings and that the trial court erred by allowing Mother to decide whether to assert her Fifth Amendment right, I respectfully dissent from the majority opinion's Section II.A.

Whether a trial court acts contrary to a statutory mandate is a question of law reviewed de novo by this Court. *In re G.C.*, 230 N.C. App. 511, 515-516 (2013).

Our General Statutes mandate that "a guardian ad litem shall be appointed in accordance with the provisions of [N.C. Gen. Stat. §] 1A-1, Rule 17, to represent a parent who is under the age of 18 years and who is not married or otherwise emancipated." N.C. Gen. Stat. § 7B-602(b) (2023). Pursuant to Rule 17, the trial court must appoint a Rule 17 Guardian ad Litem ("GAL") for minor parents and incompetent adults when they are defendants in actions or special proceedings. *See* N.C. Gen. Stat. § 1A-1, Rule 17(b)(2) (2023). "The guardian so appointed shall . . . file his answer to the complaint" and "the court may proceed to final judgment as effectually and in the same manner as if there had been personal service upon the said infant or incompetent persons or defendants." *Id.*

Rule 17 "[g]uardians ad litem are appointed to stand in place of minor children in all civil actions and proceedings as minors are presumed by law not to have the requisite capacity to handle their own affairs." *In re Papathanassiou*, 195 N.C. App.

278, 285 (2009) (citing *In re Clark*, 303 N.C. 592 (1981)). As such, a Rule 17 GAL appointed to a minor parent "divest[s] the parent of their fundamental right to conduct his or her litigation according to their own judgment and inclination." *In re J.A.A.*, 175 N.C. App. 66, 71 (2005) (citation omitted); *see* N.C. Gen. Stat. § 1A-1, Rule 17(b)(2). A Rule 17 GAL's role is to act "as a guardian of procedural due process for the parent, to assist in explaining and executing her rights . . . to the fullest extent feasible and to do all things necessary to secure a judgment favorable to such party." *In re A.S.Y.*, 208 N.C. App. 530, 540 (2010) (citations omitted).

"'Rule 17 contemplates *active participation* of a GAL in the proceedings for which the GAL is appointed'" such that "'the presence and *active participation* of a GAL appointed according to the provisions of Rule 17 effectively removes any legal disability of the party that is so represented.'" *In re D.L.P.*, 242 N.C. App. 597, 601 (2015) (emphasis added) (quoting *In re A.S.Y.*, 208 N.C. App. at 538). Thus, when a Rule 17 GAL is appointed, the Rule 17 GAL is the one who must decide whether the minor parent will waive important rights–not the minor parent. *In re P.D.R.*, 224 N.C. App. 460, 470-71 (2012) (vacating and remanding the order on appeal after determining that a parent who had a Rule 17 GAL could not independently waive her right to counsel and must obtain her Rule 17 GAL's consent to waive counsel).

Here, Mother was appointed a Rule 17 GAL due to her age and status as a minor parent who was not married or otherwise emancipated. The trial court appointed Mother's Rule 17 GAL at some point before 14 May 2024, when the first

hearing took place on the need for Amy to remain in nonsecure custody with DSS.[5] There is no record evidence that Mother's Rule 17 GAL filed an answer, as required by Rule 17. Although the transcript indicates that the Rule 17 GAL was present at the adjudication hearing, the transcript does not indicate that the Rule 17 GAL participated in the hearing. The Rule 17 GAL did not speak when the trial court gave Mother a statement of her rights, and the trial court did not ask the Rule 17 GAL whether Mother should waive her right against self-incrimination under the Fifth Amendment to the Constitution of the United States.

The trial court had the following exchange with Mother's attorney and Mother when DSS called Mother to testify:

> [Mother's Attorney]: Your Honor, just for the record I would object to the County calling [Mother]. I understand that she is a parent in this case. However, she is also a juvenile and has the services of a Rule 17 Guardian ad Litem. So I would just like to put that objection on the record.
>
> The Court: All right. Well, the objection is overruled at this point. I will give her the same advisement. Is she, is she charged as well?
>
> [DSS]: She is under a Juvenile Petition.
>
> The Court: Okay.
>
> [Mother's Attorney]: That is, that is correct, Your Honor.

---

[5] There is no order in the record showing the initial appointment of the Rule 17 GAL for Mother. However, in an order entered 14 May 2024, the trial court listed "Miya Bryant, Rule 17 GAL for [Mother]" as "present for the hearing," indicating that she was appointed some time before the first hearing on the need for Amy to remain in nonsecure custody with DSS.

3

The Court: Felony charges?

[Mother's Attorney]: Yes, there are three felonies, Your Honor.

The Court: Okay. All right. So, with regard to those three felonies, [Mother] you do have the right to remain silent, okay.

[Mother]: Thank you, your Honor.

The Court: Now, I'm at this point, like with regard to the father that testified, I'm not willing to accept just a blanket refusal to testify based on the Fifth Amendment in this case. Because there again, are plenty of questions that could be asked of you that would be relevant to this proceeding but not necessarily incriminating your juvenile case. So I have to take it on a case-by-case basis. But just understand that you have that right. If you feel you are being asked a question that might, if answered, incriminate you in your criminal case then you have that right to raise your Fifth Amendment, and you can stop and decide whether or not it's something that you need to answer. Okay?

[Mother]: Okay. Thank you, Your Honor.

The Court: You have any questions about that?

[Mother]: No, Your Honor.

Mother then testified for approximately one hour with no apparent participation or guidance from her Rule 17 GAL. Mother gave numerous potentially incriminating answers during her testimony, including that she lied to DSS and to her mother about Amy; that she was Amy's "primary caretaker" during the time period in which Amy sustained her first set of injuries; and that she rejected Dr. Northrop's medical opinion that constipation did not cause Amy's rib fractures.

4

Mother answered every question on direct examination except for one:

> [DSS Attorney]: So, let's get back to [Amy's] injuries. How did she get the broken tibia?
>
> [Mother]: I couldn't -- I'd like to exercise my right to remain silent.
>
> [DSS Attorney]: So, you are refusing to answer the question?
>
> [Mother's Attorney]: Objection, Your Honor. She's already exercised her right.
>
> The Court: Court notes she is exercising her right to remain silent.

Because Mother's Rule 17 GAL was responsible for determining whether Mother should waive or invoke her Fifth Amendment right against self-incrimination when being compelled to testify, *In re P.D.R.*, 224 N.C. App. at 464-65, the trial court erred by allowing Mother to waive her Fifth Amendment right without the active participation of her Rule 17 GAL.

DSS cites *Wall v. Timberlake,* 272 N.C. 731 (1968), and *State v. Bond,* 345 N.C. 1 (1996), to support its argument that "[i]t is well-established that our courts will not presume error from a silent record." *Wall* is not pertinent to the issue before us and *Bond* is distinguishable. In *Bond*, the Court concluded that Defendant could not show error in an unrecorded bench conference. 345 N.C. at 26. Unlike in *Bond*, the silent record in this case *is the evidence* that the GAL did not actively participate in the hearing. And, while Rule 17 and N.C. Gen. Stat. § 7B-602 do not specify what

5

constitutes "active participation" by a Rule 17 GAL, the record must indicate that the Rule 17 GAL participated in some manner. *See In re J.E.B.*, 376 N.C. 629, 636 (2021) (affirming termination of parental rights where a Rule 17 GAL presented arguments to the trial court on two grounds, "examined witnesses" and "otherwise performed trial functions" "in coordination with [the parent's attorney]"); *In re W.K.*, 376 N.C. 269, 275-76 (2020) (affirming termination of parental rights where a Rule 17 GAL "spoke on the record only five times during" a hearing, did not speak on the record during another hearing, and could not offer "anything beyond repeating counsel's arguments").[6]

Mother was a minor parent who, by law, lacked the capacity to make an informed decision about whether to waive a fundamental right, and she was unable to act on her own behalf in a court proceeding. I thus dissent from the majority opinion's determination in Section II.A that the trial court did not err by allowing Mother to decide whether to assert her Fifth Amendment right.

---

[6] *In re J.E.B.* and *In re W.K.* involve termination of parental rights proceedings and cite to N.C. Gen. Stat. § 7B-1101.1. This case involves an adjudication of abuse and neglect and cites to N.C. Gen. Stat. § 7B-602. However, the language in N.C. Gen. Stat. § 7B-1101.1(a)-(d) and N.C. Gen. Stat. § 7B-602(a)-(d) is identical.